**Robert PUGH and Nathaniel Henderson et al., Plaintiffs-Appellants,**

**v.**

**James RAINWATER et al., Defendants-Appellees.**

No. 72–1223.

United States Court of Appeals, Fifth Circuit.

Aug. 22, 1977.

Rehearing En Banc Granted Oct. 18, 1977. See 562 F.2d 362.

---

6. *See* n. 4, *supra.*

Phillip A. Hubbart, Public Defender, Bennett H. Brummer, Asst. Public Defender, Eleventh Judicial Circuit of Fla., Bruce S. Rogow, Miami, Fla., for plaintiffs-appellants.

Peter Nimkoff, Pearson & Josefsberg, Lewis M. Jepeway, Jr., Miami, Fla., amicus curiae, for Dade County Bar Assn.

Duke Winsor, Legal Unit, Public Safety Dept., James R. Jorgenson, Stuart Simon, County Atty., Alan T. Dimond, Asst. County Atty., Miami, Fla., for Purdy.

Robert L. Shevin, Atty. Gen., Raymond L. Marky, Asst. Atty. Gen., Tallahassee, Fla., for Sutton, Rainwater, Ferguson, Adair, Snowden, and Berkman.

Frank Miles, City Atty., Hialeah, Fla., for Maynard.

Aaron Foosaner, Miami Beach, Fla., for Perry.

Joseph Pardo, Miami, Fla., for Segall.

Jack Blumenfeld, Milton Robbins, Asst. State's Atty., Miami, Fla., for Gerstein.

Joseph A. Wanick, City Atty., and Henry Edgar, Asst. City Atty., Miami Beach, Fla., for Pomerance.

Alan H. Rothstein, Larry J. Hirsch, Asst. City Atty., Montague Rosenberg, Asst. City Atty., Miami, Fla., for Bernard Garmire.

Paul H. Zacks, Asst. Atty. Gen., West Palm Beach, Fla., for defendants-appellees.

Before GEWIN and SIMPSON, Circuit Judges.[*]

SIMPSON, Circuit Judge:

Since Florida's admission to the Union persons charged in the courts of that state with bailable offenses were entitled to obtain pretrial freedom by paying or having a surety pay to the court a sum of money refundable upon appearance at trial. Plaintiffs in the instant case, indigent pretrial detainees[1] suing on behalf of themselves and others similarly situated, maintain that this traditional practice denies them equal protection of the law by conditioning their right to pretrial freedom on wealth-based criteria. We agree and hold that equal protection is not satisfied unless a judge is required to consider less financially onerous

---

[*] Judge Bell was a member of the original panel at the time of oral argument, but resigned from the court prior to decision of this case, which is decided by a quorum. Title 28, U.S.C. § 46(d).

1. The district court granted plaintiffs' motion to proceed in forma pauperis. Plaintiff Robert W. Pugh's last employment paid him only room and board and his total assets at the time of filing this suit were $11.18. He was charged with robbery, a crime punishable by life imprisonment. He would have been entitled to bail unless a judge found that "the proof of guilt is evident or the presumption is great". Fla. Const., Art. I § 14. Plaintiff Nathaniel Henderson had been earning $320 per month prior to his arrest and pretrial detention. He had no assets and had been supporting two daughters. R. 24–25. Although all the named plaintiffs have been convicted and are no longer pretrial detainees, the claims of the unnamed members of the class are not mooted. *Gerstein v. Pugh*, 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 861 n. 11, 43 L.Ed.2d 54, 63 n. 11 (1975).

forms of pretrial release before he imposes money bail.[2]

## I.  INTRODUCTION

We preface our opinion by noting that we are asked to resolve a small part of a much larger problem.[3] The practice of incarcerating indigent defendants prior to trial has sparked a flood of litigation in recent years.

At first, advocates of bail reform brought their case before the state legislatures and Congress.  Despite initial success,[4] the movement became stalled.[5] Perhaps as a result, vindication of the rights of pretrial detainees was increasingly sought in the federal courts.  Almost without exception, the cases challenged the conditions, not the fact of pretrial detention.[6] The guiding

2. So far as we can determine, no other appellate court has ever decided this precise issue. In *Rigney v. Hendrick,* 355 F.2d 710 (3d Cir. 1965), cert. denied, 384 U.S. 975, 86 S.Ct. 1868, 16 L.Ed.2d 685, the Third Circuit held that an indigent pretrial detainee who was compelled to appear at a lineup was not deprived of equal protection.  The Court stated: "Admittedly, there is a classification between those who can and those who cannot make bail.  The Constitution, however, permits such a classification, and any differences here, arise solely because *of the inherent characteristics of confinement* and cannot constitute invidious discrimination." *Id.* at 715. *Rigney,* however, did not involve a claim that the pretrial incarceration itself was a violation of equal protection.  The Eighth Circuit has explained the rationale of *Rigney* as follows: "Since defendants who are free on bail can be compelled to submit to lineups, defendant was not denied due process of law or deprived of equal protection of law by being required to participate in a lineup while he was incarcerated because he was unable to post bail." *United States v. Scarpellino,* 431 F.2d 475, 479–80 (8th Cir. 1970).  In *United States v. Gaines,* 449 F.2d 143 (2d Cir. 1971), on facts more analogous to the instant case, the Second Circuit found an equal protection violation.  See note 14 *infra.* Also, the use of a "master bond list" has been held to violate equal protection. *Ackies v. Purdy,* 322 F.Supp. 38 (S.D.Fla.1970).

3. Available statistics indicate that large numbers of people are imprisoned before trial, often because they cannot afford bail.  One commentator estimated that "each day, about one hundred thousand people in the United States are being detained pending trial." Note, *The Conditions of Pre-Trial Detention,* 79 Yale L.J. 941, 942 (1970).  A federal census of city and county jails by the Census Bureau for the Law Enforcement Assistance Administration found that as of March 15, 1970, 160,863 people were incarcerated in 4,073 jails used for periods of detention greater than 48 hours.  Of those, 52 percent had not been convicted; 35 percent had been arraigned and were awaiting trial, 17 percent awaited arraignment.  New York Times, January 7, 1971, p. 1.  During the first 11 months of 1974, the pretrial holding cells of the Duval County Jail in Jacksonville, Florida, held 17,806 inmates for periods ranging from

one to eight days. *Miller v. Carson,* 401 F.Supp. 835, 869 (M.D.Fla.1975).  The Director of the Corrections and Rehabilitation Department of Dade County, Florida, testified that on June 3, 1971, approximately 500 pretrial detainees were housed in the Dade County Jail (where the instant plaintiffs were incarcerated) and the Dade County Stockade, and that the majority of those were imprisoned because they could not afford bail.  R. 308–10.  In January 1976, a United States District Judge in Miami found that 28 percent of the pretrial detainees at the Dade County Jail were there solely because they could not afford bail. *Bridges v. Sandstrom,* No. 74–994–Civ–JE (S.D. Fla. Jan. 14, 1976).

4. Most notably the Federal Bail Reform Act of 1966, 18 U.S.C. § 3146 (1970).  See Ares, Rankin & Sturz, *The Manhattan Bail Project,* 38 N.Y.U.L.Rev. 67 (1963); Note, *Preventive Detention Before Trial,* 79 Harv.L.Rev. 1489, 1493 (1966).

5. Wice, *Bill Reform in American Cities,* 9 Crim. L.Bull. 770. (1973).

6. The cases are legion.  Some samples are: *Taylor v. Sterrett,* 499 F.2d 367 (5th Cir. 1974), and 532 F.2d 462 (5th Cir. 1976); *Anderson v. Nosser,* 438 F.2d 183 (5th Cir. 1971), aff'd in part, rev'd in part, 456 F.2d 835 (1972) (en banc); *Duran v. Elrod,* 542 F.2d 998 (7th Cir. 1976); *Detainees of Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392 (2d Cir. 1975); *Rhem v. Malcolm,* 507 F.2d 333 (2d Cir. 1974) and 527 F.2d 1041 (2d Cir. 1975); *Bridges v. Sandstrom,* No. 74–994–Civ–JE (S.D.Fla. Jan. 14, 1976); *Mitchell v. Untreiner,* 421 F.Supp. 886 (N.D.Fla. 1976); *Miller v. Carson,* 401 F.Supp. 835 (M.D.Fla.1975); *Dillard v. Pitchess,* 399 F.Supp. 1225 (C.D. Cal.1975); *Wilson v. Beame,* 380 F.Supp. 1232 (E.D.N.Y. 1974); *Inmates of Suffolk Cty. Jail v. Eisenstadt,* 360 F.Supp. 676 (D.Mass.1973), aff'd 494 F.2d 1196 (1st Cir.), cert. denied, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); *Inmates of Milwaukee Cty. Jail v. Peterson,* 353 F.Supp. 1157 (E.D.Wis.1973); *Hamilton v. Landrieu,* 351 F.Supp. 549 (E.D.La.1972); *Smith v. Sampson,* 349 F.Supp. 268 (D.N.H.1972); *Collins v. Schoonfield,* 344 F.Supp. 257 (D.Md.1972);

**1192**

principle in each case has been that prior to trial a defendant is presumed innocent; his incarceration during that period is permissible only to assure his appearance at trial, not to inflict punishment. See e.g. *Miller v. Carson*, 401 F.Supp. 835, 865–67 (S.D.Fla. 1975). On this basis the courts have ordered sweeping changes [7] in the character and administration of state prisons to assure that pretrial detainees, most often those with little or no resources, are not punished before they are found guilty.

Today we decide a narrow issue: whether the imprisonment of an indigent prior to trial solely because he cannot afford to pay money bail violates his right to equal protection under the Fourteenth Amendment. At least therefore we do not face the unpleasant task of considering the number of roaches and rats, the extent of disease, lack of sanitary facilities and overcrowding tolerable under minimal constitutional safeguards. But we cannot escape awareness that conditions in many pretrial detention centers have shocked the conscience of courts across the nation.[8] Without unlimited state funds it is questionable whether any number of federal court orders can transform such pestholes into proper accommodations which do not punish those presumed to be innocent.[9] The issue before us boils down to whether an indigent, already

*Brenneman v. Madigan*, 343 F.Supp. 128 (N.D. Cal.1972); *Hamilton v. Love*, 328 F.Supp. 1182 (E.D.Ark.1971); *Jones v. Wittenberg*, 323 F.Supp. 93 (N.D.Ohio 1971), aff'd sub nom., *Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972).

7. One Court enjoined the mayor of New York City from confining any persons in that city's famous "Tombs" after a certain date. *Rhem v. Malcolm*, 377 F.Supp. 995, 1000 (S.D.N.Y. 1974), remanded, 507 F.2d 333 (2d Cir.), on remand, 389 F.Supp. 964 (1975), aff'd, 527 F.2d 1041.

8. A federal district court found the following conditions to exist in the Duval County, Florida Jail:

All inmates, if kept overnight, were required to sleep in their own clothes, without benefit of a mattress, blanket, sheet, pillow or towel . . . . Inmates were kept under these conditions from one to eight days. There were no means for brushing their teeth or showering. . . . There were drunks, mental cases, homosexuals, first offenders, and recidivists. There was sometimes vomitus, urine and feces on the floor. Attempts were made to clean and mop regularly, but conditions were so bad that acceptable sanitation was impossible. Syphilis, gonorrhea, body lice, hepatitis, and broken bones were admitted in the holding cell mix. Lighting in the cells was and is still very poor. Meals were served at regular times, but conditions were so bad that food had to be eaten while standing because of lack of sitting space. . . . [T]he whole situation could only be classified . . . as "depraved", and . . . as "animal-like."

\* \* \* \* \* \*

Cockroaches, mice and rats were in abundance, and despite some attempt through the use of a contract pest control company to eradicate these nuisances, they are still present. The problem was found by the Court to be so severe that inmates sometimes passed their idle time trapping mice and rats. There was evidence of rat and cockroach excreta in the kitchen and officer dining room areas. . . .

\* \* \* \* \* \*

In summary, the overall environment of the inmate housing areas of the Duval County Jail gave one the psychological feeling of being trapped in a dungeon. *Miller v. Carson*, 401 F.Supp. 835, 869, 871–72 (S.D.Fla. 1975).

A Florida Circuit Judge made the following findings of fact regarding the place in which the instant plaintiffs were detained:

The Dade County Jail is greatly overcrowded. . . . Inmates, who have not yet been tried or convicted of any offense are burned, sexually assaulted, beaten, abused and mistreated by fellow inmates. . . . The rule of the jungle exists in the cells where might is right, resulting in many prisoners being denied the food necessary to sustain life. *Lowery v. Metropolitan Dade County*, 43 Fla.Supp. 84 (Fla. 11th Jud. Cir. 1971).

9. The Second Circuit, after conceding that New York City was beset by "financial difficulties", noted that conditions of pretrial detention "cannot be extended to justify the denial of other unrelated rights for budgetary reasons". *Rhem v. Malcolm*, 527 F.2d 1041, 1043 (2d Cir. 1975). The abstract correctness of this assertion granted, we recognize that it is simpler to order prison reform than to pay for it. The New York Times recently noted that "[l]egislators dislike allocating the money, because expenditures on prisons are unpopular with voters". *Crime Pays—A Prison Boom*, New York Times, July 7, 1977, Sec. 3, p. 1.

denied the material comforts many of us take for granted, may be condemned to pretrial imprisonment under barbaric conditions for no other reason than his poverty.

## II. PROCEDURAL HISTORY

This case comes to us after a complex procedural history.

In 1971, the plaintiffs brought a class action [10] against eight judges and other state officials including the State Attorney, Richard Gerstein, of Dade County, Florida, asking the federal district court to declare unconstitutional and to enjoin two practices of the defendants: (1) pretrial detention of arrestees without a judicial determination of probable cause, and (2) pretrial detention of indigent defendants solely because they were unable to post money bail as a condition of release.[11] The trial court held for

**10.** Pursuant to 42 U.S.C. § 1983 (1970).

**11.** In 1971, when this action was instituted, the Florida Rules of Criminal Procedure promulgated by the Florida Supreme Court pursuant to its rule-making power, Fla.Const. (1968), Art. V § 2(a), contained no provision to guide the judge in setting bail. The 1968 Constitution (still in effect) provided for bail but set no guidelines:

> Until adjudged guilty, every person charged with a crime or violation of municipal or county ordinance shall be entitled to release on reasonable bail with sufficient surety unless charged with a capital offense or an offense punishable by life imprisonment and the proof of guilt is evident or the presumption is great. Fla.Const., Art. I § 14.

A statute (also still in effect today), granted power to the Florida Parole and Probation Commission, upon request of the court, to make an investigation and report to the court regarding factors relevant to setting bail, including "[o]ther facts that may be needed to assist the court in its determination of the indigency of the accused and whether he should be released on his own recognizance"; however, "[t]he court shall not be bound by the recommendations". Fla.Stat. § 903.03(2)(a)(3) and (2)(b). In December 1972, the Florida Supreme Court adopted a comprehensive revision of its Rules of Criminal Procedure, effective February 1, 1973. *In re Florida Rules of Criminal Procedure,* 272 So.2d 65 (Fla.1972). The 1972 revision contained the following rule governing the setting of bail:

> (4) Hearing at First Appearance.
> The purpose of bail is to insure the defendant's appearance. The judge shall, therefore, at the defendant's first appearance, consider all available relevant factors to determine whether bail is necessary to assure the defendant's appearance and, if so, the amount of bail. The judge may, in his discretion, release a defendant on his own recognizance.

Fla.R.Crim.P. 1.130(b)(4) (1973).

This rule has since been amended, effective July 1, 1977, and now reads as follows:

> Rule 3.130. Pre-trial Release
> (a) Offenses Less Than Capital. All persons in custody for the commission of an offense unless it is a capital offense or an offense punishable by life imprisonment and the proof of guilt is evident or the presumption is great shall be entitled as of right to be admitted to bail before conviction. After conviction bail may be granted by either the trial or appellate court.
> (b) First Appearance
> &ast; &ast; &ast; &ast; &ast; &ast;
> (4) Hearing at First Appearance.
> (i) The purpose of bail is to insure the defendant's appearance. For the purpose of this rule, bail is defined as any of the following forms of release:
> (1) Personal recognizance of the defendant;
> (2) Execution of an unsecured appearance bond in an amount specified by the judge;
> (3) Placing the defendant in the custody of a designated person or organization agreeing to supervise him;
> (4) Placing restrictions on the travel, association, or place of abode of the defendant during the period of release;
> (5) Requiring the execution of a bail bond with sufficient solvent sureties, or the deposit of cash in lieu thereof; or
> (6) Imposing any other condition deemed reasonably necessary to assure appearance as required, including a condition requiring that the defendant return to custody after specified hours.
> (ii) The judge shall at the defendant's first appearance consider all available relevant factors to determine what form of release is necessary to assure the defendant's appearance. If a monetary bail is required, then the judge shall determine the amount.
> (iii) In determining which form of release will reasonably assure appearance, the judge shall, on the basis of available information, take into account the nature and circumstances of the offense charged, the weight of the evidence against the defendant, the defendant's family ties, employment, financial resources, character and mental condition, the length of his residence in the community, his record of convictions, and his record of appearance at court proceedings or of flight to avoid prosecution or failure to appear at court proceedings.
> (iv) Information stated in, or offered in connection with, any order entered pursuant

the plaintiffs on the first charge and for the defendants on the second. *Pugh v. Rainwater,* 332 F.Supp. 1107 (S.D.Fla.1971). The State Attorney, Richard Gerstein, appealed on the probable cause question and the plaintiffs appealed on the bail question by separate appeals to this court. After oral argument, we remanded (by an unpublished order) for further findings on the probable cause issue and the district court reaffirmed its original ruling. *Pugh v. Rainwater,* 355 F.Supp. 1286 (S.D.Fla.1973). We then affirmed on the probable cause issue with modifications. *Pugh v. Rainwater,* 483 F.2d 778 (5th Cir. 1973). After defendant Gerstein petitioned the Supreme Court for certiorari, we issued an order holding the bail issue in abeyance pending the Supreme Court's decision. The Court affirmed with modifications our holding on the probable cause issue. *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

On November 11, 1975, we held oral arguments on the bail aspect of this case. At that time we suggested that counsel give the Supreme Court of Florida an opportunity to revise its rule of criminal procedure regarding pretrial release, thus obviating the need for action by this Court. The Florida Supreme Court had earlier rejected an amendment to its criminal rules that would have accommodated the plaintiffs' wishes. *In re Florida Rules of Criminal Procedure,* 272 So.2d 65 (Fla.1972). On several occasions after the 1975 oral argument, plaintiffs' attorneys presented their case to the Florida Supreme Court and to appropriate committees of the integrated Florida Bar. Finally, the Florida Supreme Court promulgated a new rule concerning bail, *The Florida Bar re Florida Rules of Criminal Procedure,* 343 So.2d 1247 (Fla.1977) (Fla.R.Crim.P. 3.130), Note 11, *supra,* but declined to adopt the specific revisions requested by the plaintiffs.

### III. THE ISSUE

It makes for clarity to delineate exactly what we are called upon to decide.

First, this case does not involve the right to bail *per se.* Regardless of whether there is a federal constitutional right to bail, cf. *Carlson v. Landon,* 342 U.S. 542, 72 S.Ct. 525, 96 L.Ed. 547 (1952), the plaintiffs here were entitled to bail by virtue of the Florida Constitution, Art. I, § 14, Note 11, *supra.* The State of Florida has chosen to guarantee bail to its citizens except in the case of crimes of the most serious nature. The issue before us is whether the state is invidiously discriminating in administering the right it has conferred.

Similarly, we are not called upon to decide whether any person is denied equal protection if he can make bail in some amount, but is unable to post the amount of bail set. We are confronted only with the question of the rights of indigents. As the Supreme Court has suggested in a different context, this distinction is not without constitutional significance:

> The individuals, or groups of individuals, who constituted the class · discriminated against in our prior cases shared two distinguishing characteristics: because of their impecunity they were completely unable to pay for some desired benefit, and as a consequence they sustained an absolute deprivation of a meaningful opportunity to enjoy that benefit . . . [Earlier cases] do not touch on the question whether equal protection is denied to persons with relatively less money on whom designated fines impose heavier burdens. Sentencing judges may, and often do, consider the defendant's ability to pay, but in such circumstances they are guided by sound judicial discretion rather than by constitutional mandate. *San Antonio Independent School District v. Rodriquez,* 411 U.S. 1, 20–22, 93 S.Ct. 1278, 1290–91, 36 L.Ed.2d 16, 35–36 (1973).

Clearly, all but the most trifling money bail would be meaningless to the indigent who lacks funds even to pay a bail bondsman. "[I]n the case of an indigent defendant, the fixing of bail in even a modest

---

to this rule need not strictly conform to the rules of evidence.

*Florida Bar re Florida Rules of Criminal Procedure,* 343 So.2d 1247 (Fla.1977).

amount may have the practical effect of denying him release". *Bandy v. United States*, 81 S.Ct. 197, 198, 5 L.Ed.2d 218, 219 (1960) Douglas, J., sitting as Circuit Justice, ruling upon an application by a federal prisoner for release on personal recognizance pending appeal. The issue before us was framed concisely by Mr. Justice Douglas in *Bandy*:

> [The] traditional right to freedom during trial and pending judicial review has to be squared with the possibility that the defendant may flee or hide himself. Bail is the device which we have borrowed to reconcile these conflicting interests. . . . It is assumed that the threat of forfeiture of one's goods will be an effective deterrent to the temptation to break the conditions of one's release.
>
> But this theory is based on the assumption that a defendant has property. To continue to demand a substantial bond which the defendant is unable to secure raises considerable problems for the equal administration of the law . . . Can an indigent be denied freedom, where a wealthy man would not, because he does not happen to have enough property to pledge for his freedom?

*Bandy v. United States, supra*, 81 S.Ct. at 198.

## IV. FRAMEWORK OF ANALYSIS

Traditional equal protection analysis grants great deference to legislative classifications. If "the distinctions drawn have some basis in practical experience", *South Carolina v. Katzenbach*, 383 U.S. 301, 331, 86 S.Ct. 803, 820, 15 L.Ed.2d 769, 788 (1966), or if "any state of facts reasonably may be conceived to justify" them, *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 399 (1961), and they are not drawn "on the basis of criteria wholly unrelated to the objective of [the] statute," *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225, 229 (1971), then the statute will withstand an equal protection challenge. "But the [Supreme] Court also has refined this traditional test and has said that a statutory classification based upon suspect criteria or affecting 'fundamental

rights' will encounter equal protection difficulties unless justified by a '*compelling* governmental interest.'" *Schilb v. Kuebel*, 404 U.S. 357, 365, 92 S.Ct. 479, 484, 30 L.Ed.2d 502, 511 (1971). The Court has stressed that in such cases the State must demonstrate that the classification is "*necessary* to promote a *compelling* governmental interest". *Dunn v. Blumstein*, 405 U.S. 330, 342, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274, 284 (1972). Thus, under the strict scrutiny test, "if there are other, reasonable ways to achieve [the State's goals] with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'" *Id.* Accordingly, our analysis must focus on four questions: (1) Does Florida's bail system create a classification? (2) If so, is that classification "suspect" or does it affect "fundamental rights"? (3) Is the State of Florida attempting to promote a compelling governmental interest by making the classification? and (4) Are less restrictive means available to effectuate the desired end?

### A. Does Florida's Bail System Create a Classification?

The plaintiffs do not allege that their bail was set solely on the basis of their lack of wealth. The record reveals that factors in addition to an accused's wealth were weighed by the defendants in determining the amount of bail. This finding strongly influenced the district judge's ruling on the equal protection question:

> In contending that they are denied release solely because of their poverty, plaintiffs ignore other factors distinguishing them from released persons. The record shows that plaintiffs' confinement is not the result of a classification based solely upon wealth, consequently they have not been deprived of their right to equal protection of the law.

332 F.Supp. at 1115.

We think, however, that the district judge misconstrued the nature of the plaintiff's complaint. The point is not whether

the judge considers factors other than wealth in deciding whether money bail is necessary and, if so, the amount; rather, our concern is with the effect of the judge's decision. A judge may weigh all factors and decide, for example, that $5000 bail each is necessary to assure the appearance at trial of two defendants. One has a $10,-000 savings account; the other is an indigent. Even though both have been assessed as presenting the same risk, the man of means can secure his pretrial freedom while the indigent has no choice but to remain in jail. A basic principle of equal protection is that "a law nondiscriminatory on its face may be grossly discriminatory in its operation". *Williams v. Illinois*, 399 U.S. 235, 242, 90 S.Ct. 2018, 2023, 26 L.Ed.2d 586, 593 (1970). Thus, the lack of deliberate discrimination on the basis of poverty is not dispositive of plaintiffs' claim.

Since the ruling of the district court in 1971, the Florida Supreme Court has promulgated new rules governing pretrial release and bail. *See* note 11 *supra*. Under the latest system, "bail" is defined as six alternative forms of release. The judge is required to "consider all available relevant factors to determine what form of release is necessary to assure the defendant's appearance. If monetary bail is required, then the judge shall determine the amount." Fla.R. Crim.P. 3.130(b)(4)(ii). Money bail is not listed as a last resort and the judge has broad discretion in deciding whether such bail is "necessary to assure the defendant's

appearance".[12] Thus, the new rules neither do away with money bail nor create a presumption in favor of release conditioned on non-financial factors. The result is that whenever a judge sets monetary bail he creates a *de facto* classification based on the defendant's ability to pay. A 1964 study on bail in the United States minced no words in describing this situation: "In a system which grants pretrial liberty for money, those who can afford a bondsman go free; those who cannot, stay in jail".[13]

### B. Does the Classification Involve "Suspect Criteria" or "Fundamental Rights"?

Although the Supreme Court has cautioned that "lines drawn on the basis of property like those of race are traditionally disfavored," *Harper v. Virginia Board of Electors*, 383 U.S. 663, 668, 86 S.Ct. 1079, 1082, 16 L.Ed.2d 169, 173 (1966), it has never held that wealth *per se* is a suspect criterion. Nevertheless, the Court has been extremely sensitive to classifications based on wealth in the context of criminal prosecutions. "In criminal trials a State can no more discriminate on account of poverty than on account of religion, race, or color". *Griffin v. Illinois*, 351 U.S. 12, 17, 76 S.Ct. 585, 590, 100 L.Ed. 891, 898 (1956). *Griffin* opened the door to equal protection attacks on procedures which, although nondiscriminatory on their face, in effect confront the indigent defendant with the "illusory choice"[14] of paying a fee he cannot afford

---

**12.** We think that the discretion granted the judge is apparent on the face of the rule. A committee note stated that the new rule "leaves it to the sound discretion of the judge to determine the least onerous form of release," but in adopting the 1977 amendments to its Rules of Criminal Procedure, the Florida Supreme Court expressly declined to adopt any committee notes. The Florida Bar re Florida Rules of Criminal Procedure, 343 So.2d 1247 (Fla.1977). See our discussion of the operation of the new rule, *infra*, pages 1200–1201.

**13.** D. Freed & P. Wald, Bail in the United States: 1964, at 21. Another study noted that the most "glaring weakness" of a money-based bail system "is that it discriminates against poor defendants, thus running directly counter to the law's avowed purpose of treating all

defendants equally". Report of the President's Commission on Law Enforcement and the Administration of Justice, The Challenge of Crime in a Free Society 131 (1967). The inequity of this system was apparent even to one of the earliest observers of the American scene: "It is evident that such [a procedure] is hostile to the poor and favorable only to the rich. The poor man has not always a security to pledge . . . ." 1 de Tocqueville, Democracy in America 55–56 (Bradley ed. 1963).

**14.** *Williams v. Illinois*, 399 U.S. 235, 242, 90 S.Ct. 2018, 2023, 26 L.Ed.2d 586, 593 (1970). Mr. Justice Frankfurter was more blunt:

To sanction such a ruthless consequence, inevitably resulting from a money hurdle erected by a State, would justify a latter-day Anatole France to add one more item to his ironic

or forfeiting an opportunity available to those who can pay: "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has". *Id.* at 19, 76 S.Ct. at 591, 100 L.Ed. at 899. The Court has extended this principle to include a situation where the amount of money a man has determines whether he is imprisoned for an offense:

> [T]he Constitution prohibits a State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full. *Tate v. Short*, 401 U.S. 395, 398, 91 S.Ct. 668, 671, 28 L.Ed.2d 130, 133 (1971).[15]

Moreover, as Chief Justice Burger noted in *Williams*, "the passage of time has heightened rather than weakened the attempts to mitigate the disparate treatment of indigents in the criminal process". 399 U.S. at 241, 90 S.Ct. at 2022, 26 L.Ed.2d at 593.[16] We conclude from these authorities that the wealth classification in the instant case warrants close judicial scrutiny.

■ Strict scrutiny is appropriate also because the inability to raise money bail necessarily affects fundamental rights of the indigent defendant. Foremost among

these rights is the presumption of innocence. *In re Winship*, 397 U.S. 358, 363, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368, 375 (1970). The Supreme Court observed in *Stack v. Boyle*, 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3, 6 (1951):

> "From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the present Federal Rules of Criminal Procedure, Rule 46(a)(1), 18 U.S.C.A., federal law has unequivocally provided that a person arrested for a non-capital offense *shall* be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. See *Hudson v. Parker*, 1895, 156 U.S. 277, 285, 15 S.Ct. 450, 453, 39 L.Ed. 424. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning."

Because they have been convicted of no crime, pretrial detainees may not be punished.

■ The sole permissible interest of the State is to assure their presence at trial. *Duran v. Elrod*, 542 F.2d 998, 999 (7th Cir. 1976). In *Anderson v. Nosser*, 438 F.2d 183,

---

> comments on the "majestic equality" of the law. "The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread." *Griffin v. Illinois, supra*, 351 U.S. at 23, 76 S.Ct. at 593, 100 L.Ed. at 901 (Frankfurter, J., concurring).

15. Applying the principles of *Williams* and *Tate*, the Second Circuit found an equal protection violation under facts analogous to those in the instant case. An indigent defendant had been unable to begin serving time on a federal sentence because he was incarcerated in state prison for lack of funds to pay bail set in connection with state charges which were eventually dropped. At first the Second Circuit rejected his claim that, under the Equal Protection Clause, he was entitled to credit against his federal sentence for time spent in state jail. *United States v. Gaines*, 436 F.2d 1069 (2d Cir. 1971). The Supreme Court vacated and remanded for reconsideration in light of the Solicitor General's suggestion that *Williams* and *Tate* demanded a contrary result. 402 U.S. 1006, 91 S.Ct. 2195, 29 L.Ed.2d 428 (1971). On

remand, the Second Circuit reversed its earlier holding, explaining:

> The Supreme Court's decisions in [*Tate* and *Williams*] indicate that a man should not be kept imprisoned solely because of his lack of wealth. If Gaines had had the money to post the state bond . . . and had then entered federal custody, he would now be eligible for his unconditional release. Gaines' lack of wealth resulted in his having to serve a sentence that a richer man would not have had to serve, an impermissible discrimination according to *Tate* and *Williams*.

*United States v. Gaines*, 449 F.2d 143, 144 (2d Cir. 1971). We impliedly accepted *Gaines* in *Lebosky v. Saxbe*, 508 F.2d 1047 (5th Cir. 1975). Although *Gaines* is instructive, it does not control our decision today.

16. See, e. g., *Mayer v. City of Chicago*, 404 U.S. 189, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971); *Rinaldi v. Yeager*, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966); *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); *Smith v. Bennett*, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961).

190 (5th Cir. 1971), aff'd in pert. part, 456 F.2d 835 (en banc), cert. denied, 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972), we concluded that "[p]unitive measures in such a context are out of harmony with the presumption of innocence".[17] Although *Duran v. Elrod* and *Anderson v. Nosser* addressed the conditions of pretrial detention, pretrial detention itself, unless justified by overwhelming necessity, cannot realistically be viewed as other than a form of punishment. The conditions under which many pretrial detainees are imprisoned are so squalid that federal court orders mandating vast improvements have been necessary to alleviate the more grievous "punishment" aspects.[18] Furthermore, in a system that prides itself on a devotion to "equal justice under the law", it is difficult to maintain that conditions common in pretrial detention centers do not punish defendants presumed innocent but that the more wholesome conditions of minimum security prisons do punish convicted criminals.

Pretrial detention may also infringe upon an accused's right to a fair trial. Courts have long recognized that the "right to freedom before conviction permits the unhampered preparation of a defense". *Stack v. Boyle, supra,* 342 U.S. at 4, 72 S.Ct. at 3, 96 L.Ed. at 6. As Mr. Justice Powell noted in *Barker v. Wingo,* 407 U.S. 514, 533, 92 S.Ct. 2182, 2193, 33 L.Ed.2d 101, 118 (1972), a leading speedy trial case, "if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense".[19]

The factors of a wealth-based classification in the context of a criminal prosecution, combined with its effect on the fundamental right to be presumed innocent and to prepare an adequate defense, persuade us that the challenged bail practices require strict judicial scrutiny.

### C. Does the Classification Serve a Compelling Governmental Interest?

■ The sole governmental interest served by bail is to assure the presence of the accused at trial. *Stack v. Boyle, supra,* 342 U.S. at 5, 72 S.Ct. at 4, 96 L.Ed. at 6; *Duran v. Elrod, supra,* 542 F.2d at 999. Fla.R.Crim.P. 3.130(b)(4)(i) properly identifies "insur[ing] the defendant's appearance" as the only purpose of bail. This is clearly a compelling interest.

■ The State also has an interest in denying pretrial release to a defendant who presents an unreasonable danger to the community. *United States v. Gilbert,* 138 U.S.App.D.C. 59, 425 F.2d 490 (1969); *Nail v. Slayton,* 353 F.Supp. 1013 (E.D.Va.1972). However, the State may not use bail to serve this end.[20] "Since the function of bail

---

17. "For instance, now," [the Queen] . . . went on . . . "There's the King's Messenger. He's in prison now, being punished; and the trial doesn't even begin till next Wednesday; and of course the crime comes last of all." "Suppose he never commits the crime?" said Alice. "That would be all the better, wouldn't it?" the Queen said . . .
Carroll, Through the Looking Glass 226–27 (Modern Library Ed.)

18. See notes 6 and 8 *supra.* The jail in which the instant plaintiffs were kept prior to trial has been the subject of state and federal court orders attempting to remedy its deplorable conditions. *Bridges v. Sandstrom,* No. 74–994–Civ–JE (S.D.Fla. Jan. 14, 1976) (two injunctions); *Lowery v. Metropolitan Dade County,* 43 Fla.Supp. 84 (Fla. 11th Jud.Cir. 1971).

19. See Note, *Bail and Its Discrimination Against the Poor: A Civil Rights Action as a Vehicle of Reform,* 9 Val.U.L.Rev. 167, 179–80 (1974). Many studies have attempted to show a high statistical correlation between pretrial

detention and subsequent conviction, suggesting that the mere fact of such incarceration prejudices a defendant by increasing the likelihood that he will be found guilty. See, e. g., Rankin, *The Effect of Pretrial Detention,* 39 N.Y.U.L.Rev. 641 (1964). A New York Court discounted one such study, observing that the correlation may be attributable to factors other than pretrial incarceration. *Bellamy v. Judges and Justices,* 41 A.D.2d 196, 342 N.Y.S.2d 137 (1973). See 8 Crim.L.Bull. 459 (1972), reprinting the plaintiff's memorandum in *Bellamy.* We express no view as to the validity of these studies for we have independently found that sufficient fundamental rights are infringed by pretrial detention.

20. See Note, *Preventive Detention Before Trial,* 79 Harv.L.Rev. 1489, 1491–93 (1966).
Although there is no evidence in the record that the defendants routinely set bail in large amounts to assure that accused persons would remain incarcerated before trial, one defendant

is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant". *Stack v. Boyle, supra,* 342 U.S. at 4, 72 S.Ct. at 3, 96 L.Ed. at 5. Other means are available to Florida to secure pretrial detention of dangerous persons.[21] Indeed, the Florida Constitution expressly withholds the right to bail in the case of certain serious crimes. Fla.Const.Art. I, § 14. We are not here asked to deprive the State of its power to protect the community from dangerous persons. Our inquiry is limited to those occasions where the State has set bail and has declared, in effect, that a person is free to reenter the community if he is willing to put up a sum of money.

D. *Is Money Bail Necessary to Promote the State's Interest in Assuring Appearance?*

In 1951, the Supreme Court observed: "Like the ancient practice of securing the oaths of responsible persons to stand as sureties for the accused, the modern practice of requiring a bail bond or the deposit of a sum of money subject to forfeiture serves as additional assurance of the presence of an accused". *Stack v. Boyle, supra,* 342 U.S. at 5, 72 S.Ct. at 4, 96 L.Ed. at 6. This assumption has not withstood the test of time. Judicial condemnation of the modern system of commercial bail bondsmen has transcended political and ideological lines in emphasizing that monetary bail set by a judge has very little to do with assuring appearance at trial.

The theory behind money bail is simple: "It is assumed that the threat of forfeiture of one's goods will be an effective deterrent to the temptation to break the conditions of one's release". *Bandy v. United States, supra,* 81 S.Ct. at 197. However, "under the professional bondsman system the only one who loses money for non-appearance is the professional bondsman, the money paid to obtain the bond being lost to the defendant in any event". *Pannell v. United States,* 115 U.S.App.D.C. 379, 320 F.2d 698, 699 (1963) (Wright, J., concurring). In this connection, "[t]he extent to which the accused is financially committed to appear is determined by the amount of collateral the bail bondsman requires for writing the bond, not how high the bail is set."[22] The ultimate effect of such a system, as Judge Wright has noted, "is that the professional bondsmen hold the keys to the jail in their pockets. They determine for whom they will act as surety—who in their judgment is a good risk. The bad risks, in the bondsmen's judgment, *and the ones who are unable to pay the bondsmen's fees,* remain in jail. The court and the commissioner are relegated to the relatively unimportant chore of fixing the amount of bail." *Id.* at 699. (Emphasis in original).

Mr. Justice Blackmun makes a similar assessment of the professional bondsman system. In *Schilb v. Kuebel,* 404 U.S. 357, 359–60, 92 S.Ct. 479, 481–82, 30 L.Ed.2d 502, 508 (1971), he wrote:

"Prior to 1964 the professional bail bondsman system with all its abuses was in full and odorous bloom in Illinois. Under that system the bail bondsman customarily collected the maximum fee (10% of the amount of the bond) permitted by stat-

---

admitted that she was occasionally motivated by such considerations in setting bail:

Q: And in these types of cases, to assure that they don't get out, you set the bond high enough so that they can't get out?

A: That's right.

\* \* \* \* \* \*

Q: When you set a high bond on a serious offense, your primary consideration is keeping that person from getting out of jail, or insuring that they will appear at trial?

A: I would say both. (R. 418, 420) (Deposition of Hon. Ruth Sutton).

**21.** See, e. g., D.C.Code App. § 23–1332, upheld in *Blunt v. United States,* 322 A.2d 579 (D.C. App.1974).

**22.** National Advisory Commission on Criminal Justice Standards and Goals, Proceedings of the National Conference on Criminal Justice, Commentary on Corrections Standard 4.4, Alternatives to Pretrial Detention, at 121. In Florida, bail bondsmen are not required to demand collateral. Cf. Fla.Stat. § 903.14.

ute, and retained that entire amount even though the accused fully satisfied the conditions of the bond. Payment of this substantial 'premium' was required of the good risk as well as of the bad. The results were that a heavy and irretrievable burden fell upon the accused, to the excellent profit of the bondsman, and that professional bondsmen, and not the courts, exercised significant control over the actual workings of the bail system." [citations omitted.] [23]

These valid criticisms of the professional bondsman system persuade us to the view that, in the case of indigents, money bail is irrelevant in promoting the state's interest in assuring appearance. The indigent cannot on his own pay the amount of bail upon which his release has been conditioned. Unless a friend or relative qualifies as surety under Fla.Stat. § 903.08 and is willing to post bond, the indigent must resort to the professional bondsman. Even if the bondsman deems him an acceptable risk, he is unable to pay the bondsman's fee. Cf.Fla. Stat. § 648.33. The incongruity of a bail system premised on the risk of forfeiting property is apparent: Those who can afford to pay a bondsman do so and thus avoid risking forfeiture of their property; indigents, who cannot afford to pay a bondsman, have no property to forfeit in the first place.

The real assurance of appearance under the present system is the risk of forfeiture assumed by the bondsman. Because the bondsman does not want to lose money, he has a powerful incentive to make sure that the defendant for whom he is surety appears at trial. Thus, the bondsman has long enjoyed legal protection as a modern day bounty hunter, entitled to arrest his principal "even under extreme circumstances".[24] In this sense, the accused pays the bondsman to perform a police function—apprehension of a person who has jumped bail. An indigent defendant released on his own recognizance would face similar consequences. Cf. Fla.Stat. § 843.15. Presumably, then, the deterrence factor is comparable regardless of whether money bail has been posted.[25]

Even though it is manifest to us that money bail is not always necessary to assure a defendant's appearance, it is necessary to consider whether other "less drastic" alternatives are available to the State. The Supreme Court of Florida, in amending its rule regarding pretrial release, has in effect conceded that many alternatives to money bail are available. It has adopted five additional forms of release, none of which is conditioned on a defendant's ability to pay. Fla.R.Crim.P. 3.130(b)(4)(i). Because the new rule appears to be a significant departure from the former heavy emphasis on money bail, see note 11 *supra*, we must determine whether it vitiates plaintiffs' constitutional objections.

The new Florida rule is patterned after the Federal Bail Reform Act of 1966, 18 U.S.C. § 3146 (1970), which provides that a person charged with a bailable offense "shall . . . be ordered released pending trial on his personal recognizance or upon the execution of an unsecured appear-

**23.** Because the professional bondsman system in effect shifts the decision regarding pretrial release from the courts to private groups, it presents additional equal protection problems. In *Lane v. Brown*, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1963), the Supreme Court invalidated an Indiana statute which granted the Public Defender discretion to deny the transcript required for an appeal from a denial of a writ of coram nobis. The Court explained: "The provision before us confers upon a state officer outside the judicial system power to take from an indigent all hope of any appeal . . . ." Id. at 485, 83 S.Ct. at 773, 9 L.Ed.2d at 897–98. By analogy, the bail bondsman system confers upon the bondsman the power to deny an indigent any hope of pretrial release. See Note, Bail: An Ancient Practice Reexamined, 70 Yale L.J. 966, 971 (1961).

**24.** "One under bail is in the vicarious custody of his bondsman whose 'dominion is a continuance of the original imprisonment,' and the principal may be apprehended by his bondsman even under extreme circumstances". *Register v. Barton*, 75 So.2d 187, 188 (Fla.1954).

**25.** "The principle deterrent against flight is the danger of being caught and suffering added detriment as a result". Foote, *The Coming Constitutional Crisis in Bail*, 113 U.Pa.L.Rev. 1125, 1163 (1965).

ance bond . . . unless the officer determines, in the exercise of his discretion, that such a release will not reasonably assure the appearance of the person as required". In that event, five alternative forms of release are prescribed in order of priority, with money bail third on the list. The statute thus creates a presumption in favor of release on recognizance, *United States v. Leathers*, 134 U.S.App.D.C. 38, 412 F.2d 169, 171 (1969), and requires consideration of three other forms of release before money bail. By contrast, while the Florida rule makes available the same release options as does the Federal Act, it omits both the presumption and the order of priority contained in its federal counterpart. Instead, it instructs the judge to "consider all available relevant factors to determine what form of release is necessary . ." We find nothing in the rule that requires a judge to give priority to forms of release that do not impose a financial burden on a defendant.[26] In fact, the Florida Supreme Court has twice rejected a presumption favoring release on recognizance.[27]

While the new Florida rule expands the options available for pretrial release, it does not provide that indigent defendants will be required to pay money bail only in the event that no other form of release will reasonably assure their appearance at trial. Because it gives the judge essentially unreviewable discretion to impose money bail, the rule retains the discriminatory vice of the former system: When a judge decides to set money bail, the indigent will be forced to remain in jail. We hold that equal protection standards are not satisfied unless the judge is required to consider less financially onerous forms of release before he imposes money bail. Requiring a presumption in favor of non-money bail accommodates the State's interest in assuring the defendant's appearance at trial as well as the defendant's right to be free pending trial, regardless of his financial status.

As a federal court we do not sit to write the rules of procedure of state courts. Plaintiffs in the instant case have not come to us with generalized complaints that the Florida rule concerning bail is unwise or not to their liking. Rather, they have presented a specific constitutional objection to the rule, that it violates an indigent's right to equal protection under the Fourteenth Amendment. We withheld decision of this issue for nearly two years on considerations of comity and out of respect for the responsibility of the Florida Supreme Court to prescribe rules for Florida courts to follow. That court has now promulgated a new rule on pretrial release which, for the reasons stated, has not in our judgment mooted the constitutional point raised by the plaintiffs. We therefore remand with instructions to the district court to fashion a remedy not inconsistent with this opinion, either on the basis of the present or an augmented record, as that court shall determine. "[W]e yet like to believe that wherever the Federal courts sit, human rights under the Federal Constitution are always a proper subject for adjudication . . ." *Zwickler v. Koota*, 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444, 450 (1967).

## V. CONCLUSION

We have been called upon to decide whether indigent pretrial detainees are de-

---

**26.** A Committee Note to the 1977 amendment states: "This proposal leaves it to the sound discretion of the judge to determine the least onerous form of release which will still insure the defendant's appearance". In adopting the amendments, however, the Florida Supreme Court expressly declined to adopt the committee notes. *Florida Bar re Florida Rules of Criminal Procedure*, 343 So.2d 1247 (Fla.1977). See note 12 *supra*.

**27.** In 1972, the Florida Supreme Court, over the strong dissent of one Justice, rejected a proposed amendment that would have created a presumption in favor of release without money bail and would have required the judge to impose the least onerous condition reasonably likely to assure the defendant's appearance. *In re Florida Rules of Criminal Procedure*, 272 So.2d 65 (Fla.1972). After the Florida court adopted the new rule in February 1977, counsel for the plaintiffs in this case filed a petition for rehearing urging an amendment making money bail a last resort. The petition for rehearing was denied over the dissent of two Justices. *Florida Bar re Florida Rules of Criminal Procedure*, 343 So.2d 1247, 1266 (Fla.1977).

prived of Fourteenth Amendment equal protection of the law when they are imprisoned solely because they cannot afford money bail set under a system that does not require the judge first to consider less financially onerous conditions of release. In evaluating this problem, we have reached several conclusions: (1) When a judge sets money bail in Florida, he creates two *de facto* classes: non-indigents who presumptively can pay for their pretrial freedom and indigents who surely cannot; (2) This classification must be strictly scrutinized under the equal protection clause because it discriminates against indigent criminal defendants and directly affects their fundamental right to be presumed innocent and to prepare an adequate defense; (3) Although Florida has a compelling interest in assuring a defendant's appearance at trial, (4) money bail is not necessary to promote that interest because the bail bondsman system eliminates the basic premise behind such bail; (5) Florida may promote its compelling interest through alternative forms of release that do not discriminate on the basis of wealth. These factors lead inexorably to the conclusion that Florida's current bail system discriminates invidiously against indigents charged with crime. We hold that it violates the equal protection rights of such indigents.

Our holding is not that money bail may never be imposed on an indigent defendant. The record before us does not justify our telling the State of Florida that in no case will money bail be necessary to assure a defendant's appearance.[28] We hold only that equal protection standards require a presumption against money bail and in favor of those forms of release which do not condition pretrial freedom on an ability to pay.

The judgment appealed from is reversed, and this cause is remanded with instruc-

tions to the district court to fashion a remedy consistent with this opinion.

REVERSED and REMANDED.

---

28. In a similar context, the Supreme Court in *Tate v. Short, supra*, 401 U.S. at 401, 91 S.Ct. at 672, 28 L.Ed.2d at 133, noted that its decision did not preclude "imprisonment as an enforcement method when alternative means are unsuccessful despite the defendant's reasonable efforts to satisfy the fines by those means; the determination of the constitutionality of imprisonment in that circumstance must await the presentation of a concrete case".