John Bellamy et al., on Behalf of Themselves and Other Persons Similarly Situated, Plaintiffs, *v.* Judges and Justices Authorized to Sit in the New York City Criminal Court and the New York State Supreme Court in New York County, et al., Defendants.

First Department, April 3, 1973.

*Robert Kasanof* of counsel (*Samuel H. Dawson, Robert H. Hermann, Linda Hupp* and *Harold J. Pokel* with him on the brief; *Legal Aid Society*), for plaintiffs.

*Amy Juviler* of counsel (*Jerold Probst* with him on the brief; *Louis J. Lefkowitz, Attorney-General*), for defendant Judges except James J. Leff.

*Lewis R. Friedman* of counsel (*Robert A. Goldschlag* with him on the brief), for Frank S. Hogan, District Attorney.

*James J. Leff,* defendant in person.

*John S. Allee* of counsel (*Asa D. Sokolow, Richard Wyle, W. Kirkland Taylor* and *Stephen M. Latimer,* with him on the brief), for New York Lawyers' Committee for Civil Rights under Law, *amicus curiae.*

KUPFERMAN, J. This is an original proceeding for declaratory judgment (CPLR 3001) instituted by the named plaintiffs, who are detained while facing criminal charges in New York County, on their behalf and as a class action (CPLR 1005, subd. [a]) on behalf of those similarly situated who are clients of the Legal Aid Society, against the Judges of the Criminal Court of the City of New York, the Justices of the Supreme Court who may sit in criminal cases in New York County, and the District Attorney, Frank S. Hogan, seeking relief under article 78 of the CPLR in the nature of prohibition and mandamus with respect to the bail system in New York State (title P of the Criminal Procedure Law, art. 500 *et seq.*) as applied to the plaintiffs.

We view the complaint as being deficient in that there is no proper basis for a class action, and so declare, because there are individual determinations to be made in every bail application, and deny the relief requested.

"The principle was stated by Judge LEHMAN in *Society Milion Athena* v. *National Bank of Greece* (281 N. Y. 282, 292): ' Separate wrongs to separate persons, though committed by similar means and even pursuant to a single plan, do not alone create a common or general interest in those who are wronged.' " (*Hall* v. *Coburn Corp. of Amer.*, 26 N Y 2d 396, 400.)

As was said in *People ex rel. Lobell* v. *McDonnell* (296 N. Y. 109, 111): "The bailing court has a large discretion, but it is a judicial, not a pure or unfettered discretion. The case calls for a fact determination, not a mere fiat. The factual matters to be taken into account include: ' The nature of the offense, the penalty which may be imposed, the probability of the willing appearance of the defendant or his flight to avoid punishment, the pecuniary and social condition of defendant and his general reputation and character, and the apparent nature and strength of the proof as bearing on the probability of his conviction ' ".

Viewing the matter as an attack on the bail system per se as being unconstitutional under the equal protection and due process clauses (U. S. Const., 14th Amdt.) as well as the Eighth Amendment to the United States Constitution and section 5 of article I of the Constitution of the State of New York, which prohibit excessive bail, there is no substance to the objections. (See *Schilb* v. *Kuebel*, 404 U. S. 357, rehearing den. 405 U. S. 948; *People ex rel. Gonzalez* v. *Warden*, 21 N Y 2d 18 [1967].)

While the reasons for the bail system seem self-evident, a decent respect for the opinions of those sincerely interested

in the proper administration of the criminal justice system leads us to examine further into the contentions of the plaintiffs.

There are those who oppose the present bail system because it provides for detention of an accused; those who oppose it because it does not provide for "preventive detention"; and those who do not like the variances in the application of the rules by individual Judges.

This, of course, is not a field for exact science, and we do the best we can in an imperfect world.

Speaking with regard to sentencing, in the Chapter on Limiting Trial Judges, of the newly issued publication "Criminal Sentences"[1], Judge MARVIN E. FRANKEL states: "I repeat my most basic objection that such unfettered variations are intolerable in a rational system of law." (p. 73). (Cf. *Furman* v. *Georgia*, 408 U. S. 238 [1972].)

The plaintiffs would have us prohibit present practices, depart from the rules as they now exist and come up with variations such as "investigate" "alternative, non-financial conditions of release" including but "not limited to" "releasing the accused into the care or custody of a qualified person or organization", "placing reasonable restrictions on the activities, associations, movement or residence of the accused", "permitting release of the accused during daytime or working hours, or imposing other conditions requiring the accused to return to custody after specified hours", etc.

These are all interesting suggestions and have been considered in Federal Courts in the District of Columbia under the Bail Reform Act of 1966 (U. S. Code, tit. 18, § 3146) which in section 2 of Public Law 89-465 provides that: "The purpose of this Act * * * is to revise the practices relating to bail to assure that all persons, regardless of their financial status, shall not needlessly be detained pending their appearance to answer charges, to testify, or pending appeal, when detention serves neither the ends of justice nor the public interest."

As was stated by the United States Court of Appeals for the District of Columbia Circuit in *United States* v. *Leathers* (412 F. 2d 169, 170 [*Per Curiam*, 1969]):

"The life of the Bail Act has been marked by woefully inadequate awareness of its requirements by the lay public, resulting in often savage and invariably unfair criticism of judges for

---

1. Reviewed by Nelson Seitel, The Lawyer's Bookshelf, N. Y. L. J., March 9, 1973, p. 4, col. 4.

simply abiding by their sworn oaths to administer the laws of the United States. But when the statute and its legislative history are unambiguous, as is the case with the Bail Reform Act, none of us on the bench has any serious alternative but to put aside his personal doubts and to apply the Act as Congress has written it.

" The Bail Reform Act was an effort by Congress to give meaning to some of our highest ideals of justice. It was, by common consent, a legislative intervention in a field where reform was badly needed, not only in the interest of individuals charged with crime but of the taxpayers as well. Those who differ about the merits of some of the Act's provisions are in agreement that a fair trial of the Act has been greatly jeopardized by its having been launched at a time of spiraling crime and lagging commitment by the Congress of the resources necessary to cope with it."

Not only are our problems here similar, but the legislative direction we have is the newly enacted (eff. Sept. 1, 1971) bail section in the new Criminal Procedure Law.

With respect to the previous laws, the Practice Commentary by Richard G. Denzer states:

" Possibly the most archaic and poorly drawn provisions of the Criminal Code were those dealing with the subject of bail (see § 550 *et seq.*). Many of them appear virtually unintelligible and, in their entirety, they presented a chaotic scheme that defies summary or analysis. In this setting, varying bail procedures developed in different localities largely on the basis of what seemed to be workable in the particular community.

" In an endeavor to bring clarity and consistency to the area of ' release on recognizance and bail,' this CPL Title takes a fresh structural and phraseological approach. Even more important, several significant changes of substance are offered.

" The first Article (Art. 500) consists solely of term definitions. The second (Art. 510) presents, in somewhat introductory fashion, certain general principles pervading this whole area. The third (Art. 520) deals with the mechanics of bail, the kinds of bail authorized and the forms of bail bonds and related instruments. The fourth (Art. 530) is addressed to questions of when, under what circumstances and by whom orders fixing bail and releasing defendants on their own recognizance may be issued during the pendency of criminal actions and of appeals from judgments of conviction. The fifth and final Article (Art. 540) is concerned solely with the subjects of forfeiture and

remission of bail (CCP §§ 593–598), a field essentially civil in character.''

It is this '' fresh approach '' by the Legislature that the plaintiffs attack and seek to strike down, undoubtedly because it does not go as far as they would like in releasing those accused held in custody.

On the other hand, in the District of Columbia, the push has been for expanded pretrial detentions. (See '' Pretrial Detention and the 1970 District of Columbia Crime Act — The Next Step in Bail Reform '' by Frederick D. Hess, 37 Brooklyn L. Rev. 277 [Winter 1971].)

A preventive detention bill introduced in the New York State Legislature was '' strongly disapproved '' by the Criminal Courts Law and Procedure Committee of the Association of the Bar of the City of New York. (The *Record,* vol. 27, No. 7, Oct., 1972, p. 25.) The chairman of that committee, Stanley S. Arkin, stated: '' It is generally agreed that the provisions of the District of Columbia Crime Act (providing for a discretionary determination of denial of pre-trial release) are open to serious constitutional challenge. Yet, this bill reflects nothing of the balanced approach of the D. C. bill and totally disregards the interests of one presumed innocent to release prior to trial.'' (N. Y. L. J., May 5, 1972, p. 1, col. 5.)

The Report of the Temporary Commission on the New York State Court System, Part II '' and Justice for All '' (1973) states (p. 67) that: '' A mutual concern of society is to insure the appearance of defendants to answer to the charges, and to maximize the release of presumptively innocent defendants who are good risks to return. Thus there is a need for as much information as possible about those defendants who do appear, those who do not, and the reasons why they do or do not appear. Currently, such information is inadequate.''

The plaintiffs with due diligence have prepared (although not in response to the Temporary Commission's suggestions) elaborate figures and statistics[2] to demonstrate, as they say, '' what common sense would dictate '' to the effect that, among other things, '' the higher the bail amount, the smaller the percentage of accused who are released.'' Also, that many of those '' released on their own recognizance never ultimately get a prison sentence, a rate twice as high as that * * * for all those for whom a bail amount is set.'' (See, also, '' Pretrial

2. '' a voluminous collection of computer printouts describing the results of a statistical study of 857 Legal Aid cases.'' (Legal Aid Society's Citations, vol. 1, No. 1, Feb., 1973, p. 1, col. 2.)

Detention and Ultimate Freedom: A Statistical Study" by Patricia Wald, 39 N. Y. U. L. Rev. 631 [1964]; Note, Bail: An Ancient Practice Reexamined, 70 Yale L. J. 966 [1961].)

These figures are supposed to lead to the conclusion contended for by the plaintiffs, that the bail system is doubly unfair, because it denies poor people their freedom pending a trial, and that such denial inevitably leads to conviction.

The claim of discrimination against the poor is answered proleptically by the very complaint in this action. The first named plaintiff, John Bellamy, is referred to as follows (par. 11):
" JOHN BELLAMY is 26 years old and resides at 2468 Seventh Avenue, New York, New York. He was arraigned on February 26, 1972 in Part AR-1 on a charge of robbery. *Bail was fixed at $500.*" (Italics added.)

The amount of bail has a rational relationship to and is adjusted to the defendant's circumstances. If it be assumed, without conceding, that a sum of money for bail was warranted, where is the excessiveness in the figure the plaintiffs themselves quote?

The briefs and papers on behalf of the District Attorney and the Attorney-General with equal diligence find fault with the statistical method and the premises used by the plaintiffs in arriving at their various conclusions.

Among other things, it is pointed out that the study prepared for the plaintiffs ignores the problem of bail and parole jumping and the fact that because of overcrowding in detention facilities, a Judge may err on the side of release. The affidavit of Judge IRVING LANG of the Criminal Court of the City of New York and Supervising Judge in New York County, states (pars. 11 and 12):

" Unfortunately the practice of releasing defendants even where there is a risk of non-appearance has resulted in an inordinately large number of outstanding bench warrants for persons who have jumped bail or parole. Between January 1, 1971 and September 30, 1972, 31,855 bench warrants were issued by the Criminal Court in New York County alone.

" This problem has unfortunately existed for some time. In his report 'Bail and Parole Jumping in Manhattan in 1967.' (addressed to the Mayor's Coordinating Committee on Criminal Justice), Andrew Schaeffer of the Vera Institute of Justice reported that in the three months between January 1 and March 30, 1967 there were 14,439 Manhattan Criminal Court defendants scheduled for future court appearances. The overwhelming majority — 10,462 — obtained pretrial release (Id. p. 2). Of those

released in those three months, 1458 (13.9%) wilfully failed to appear ".

In addition, the study prepared for the plaintiffs in this original proceeding is based on the situation *before* the effective date of September 1, 1971 for the present bail statute. Moreover, by an amendment effective September 1, 1972 (CPL 520.10, subd. 2, par. [a]), two types of bail became the more usual form " (g) an unsecured surety bond and (h) an unsecured appearance bond ", meaning that an accused would not have to deposit any money and merely incurs a legal obligation.

The Practice Commentary by Mr. Denzer, as to the 1971 version, made even more liberal in its financial impingement by the 1972 amendment, states as follows: " The theory of these innovations is that a judge who, despite an inclination to release a ' good risk ' defendant, feels impelled to fix bail in an amount which may be beyond the defendant's means under the former system, may achieve that release without reducing the bail sum. In short, by relaxing the *forms* of bail rather than the *amount* thereof, the unsecured and partially secured bonds should provide a method of release somewhere between bail as presently authorized and release on one's own recognizance; and should furnish a method of reducing to some extent that portion of our prison population consisting of unconvicted defendants."

Sydney Smith put it well when he quoted: " nothing was so fallacious as facts, except figures."

Oliver Wendell Holmes, Jr. in his " The Common Law " stated that the " life of the law has not been logic: it has been experience ".

Both experience and logic show us that, all other imperfections and discrepancies aside, the plaintiffs' figures and statistics are but a shadow of reality, misconstruing cause and effect and putting the cart before the horse. A Judge in his expertise and in applying the bail rules heretofore set forth (*People ex rel. Lobell* v. *McDonnell*, 296 N. Y. 109, *supra*) may decide to hold the defendant. It is not because bail is required that the defendant is later convicted. It is because he is likely to be convicted that bail may be required.

As Chief Justice BURGER has said, " At any given time, two-thirds of the persons found in prisons have been previously confined for criminal acts." (American Bar News, vol. 18, No. 2, Feb. 1973, p. 5, col. 1.)

The factors for allowing bail, when properly applied, generally lead to a conclusion that those denied bail are more likely

to be convicted, and if the statistics prove this out, as they do, it shows the system is working rather than, as plaintiffs contend, that it is, instead, detrimental to a defense against an accusation.

Plaintiffs contend further that there is a failure "to provide meaningful procedures for prompt judicial review of bail determination". This is, of course, incorrect. (CPL 460.50; CPLR 7002. See, e.g., *People ex rel. Machuca* v. *Glick,* 38 A D 2d 916 [1st Dept., 1972].) The most recent dispute on an appeal involved the question of which court could move faster with a stay in a habeas corpus proceeding, the State or the Federal court. (Cf. *People* v. *Doe, Matter of WBAI-FM, People* v. *Goodman,* 38 A D 2d 905 [1st Dept., 1972] with *United States ex rel. Goodman* v. *Kehl,* 456 F. 2d 863 [2d Cir., 1972].)

Concerned citizens will concur, despite the expense,[3] with Chief Justice BURGER's agreement (when on the United States Court of Appeals for the District of Columbia Circuit): "to the need for experimenting with various devices for release on personal assurances to the end that more discriminating release procedures can be developed." (*McCoy* v. *United States,* 357 F. 2d 272, 274 [dissent, D. C. Cir. 1966].) Nor can there be any quarrel with unhappiness over dingy and dirty courtrooms, shortage of personnel, and length of calendars which require speed-up determinations on bail.

The courts and the Legislature must continue to be vigilant in the protection of basic liberties for the accused and for society. However, while in an individual case from time to time, error may occur and should be redressed, no constitutional impediment exists to the present New York State bail system as correctly applied. Further, the adoption of a "nonfinancially oriented system of bail", also urged by *amicus curiae,* New York Lawyer's Committee for Civil Rights Under Law, has been said by our Court of Appeals to be "more properly within the province of the Legislature." (*People ex rel. Gonzalez* v. *Warden,* 21 N Y 2d 18, 24, *supra.*)

---

3. "The arguments against this overhaul of the bail system would probably involve differing variations of the 'system maintenance' theme. Individualized determination of the conditions imposed on release would take time, and might require the appointment of additional judges. Where financial security is required, handling of the collateral might require the appointment of additional administrative personnel. To be balanced against these added expenses, however, is the likely reduction in the cost of maintaining detention pens, and the savings arising from permitting the accused to retain his employment, thereby keeping his family off the community relief rolls." (Note, Bail, 70 Yale L. J. 966, 977, *supra.*)

Judgment should, therefore, be granted declaring that the bail system attacked by plaintiffs is constitutional, and that there is no proper basis for a class action herein; and, insofar as relief is sought under article 78 of the CPLR, the petition should be dismissed, without costs and without disbursements.

STEVENS, P. J., MARKEWICH and NUNEZ, JJ., concur with KUPFERMAN, J.; McGIVERN, J., concurs in result only.

Judgment unanimously granted in favor of defendants declaring that the bail system attacked by plaintiffs is constitutional, and that there is no proper basis for a class action; and, insofar as relief is sought under article 78 of the CPLR, the application is denied and the petition dismissed, without costs and without disbursements.