OPINION OF THE COURT
Dominic R. Massaro, J.
Huwe Burton was arrested on January 6, 1989, and charged with the murder of his mother. Indicted for this and related crimes, the then 16-year-old tenth grader was arraigned on February 8th; bail was set in the amount of $150,000 cash or surety bond (Hecht, J.). Thereafter, Mr. Burton’s case was referred to this court for all purposes. On February 23, 1989, on application, the bail amount was reduced to $100,000. In order to gain his liberty pending trial, and in accord with the New York bail statutes, Mr. Burton attempted to post a bond secured by real property.
CPL 500.10 (17) defines "secured bail bond”. Paragraph (b) sets forth the requirement for this type of bond where the proffered collateral is comprised of real rather than of personal property. In essence, it provides that the value of the property must be "at least twice the total amount of the undertaking.” It is noteworthy that said value does not equate with fair market value; rather, it is determined by a complex "class” formula: dividing the property’s last assessed value by an equalization rate set by assessing authority wherein the property is situated, and by deducting from the quotient the amount of any outstanding lien(s) and/or encumbrance(s).
There is a "blended” equalization rate for New York State, a control figure maintained by the State Board of Equalization and Assessment that reflects a weighted averaging of the equalization rates for all classes of real property.[1] The Real Property Tax Law, however, provides for the creation of "special assessing units”; the City of New York qualifies as one such unit (see, Real Property Tax Law § 1801 [a]; § 1803 [1]). With respect to Mr. Burton’s attempted posting of realty, *217 this court on a prior occasion has opined, "[a] fair reading of section 500.10 (17) suggests that defendant is entitled to benefit from use of the equalization rate established by the City of New York for the specific class of property sought to be posted here.”[2] (People v Burton, 148 Misc 2d 716, 720.)
The property in question is a two-family house, defined as a "Class I” property. The applicable municipal class rate for Class I properties is 8.9%. The parcel’s last assessed value is $28,400. Divided by the more beneficial 8.9% class equalization rate, the resulting valuation is $319,101.12. Deducting $163,511.20 for an outstanding first mortgage, the remaining equity was found to be $155,589.92, an amount more than $44,000 deficient of the $200,000 required under a strict reading of the statute.
Accordingly, the court found the subject property insufficient to satisfy " 'at least twice the total amount’ * * * of the bail previously fixed at $100,000.” (Supra, at 720.)
In a footnote to its opinion, the court noted: "Said determination leaves for another day consideration of * * * the singular statutory requirement for 'at least twice the total amount of the [required] undertaking’ * * * with respect to securing bail with realty (as opposed to cash, personalty or any other form of surety bond).” (Supra, at 720, n 5.) That day has arrived. Mr. Burton now calls upon the court to declare paragraph (b) of CPL 500.10 (17) unconstitutional.[3]
In extenso, the challenged section reads as follows:
"17. 'Secured bail bond’ means a bail bond secured by either:
"(a) Personal property which is not exempt from execution and which, over and above all liabilities and encumbrances, has a value equal to or greater than the total amount of the undertaking; or
*218 "(b) Real property having a value of at least twice the total amount of the undertaking. For purposes of this paragraph, value of real property is determined by dividing the last assessed value of such property by the last given equalization rate of the assessing municipality wherein the property is situated and by deducting from the resulting figure the total amount of any liens or other encumbrances upon such property” (CPL 500.10 [17]).
The defense mounts a two-pronged attack on the statute, contending that the subdivision: (1) discriminates as a class against those persons whose assets consist primarily of real rather than of personal property in violation of the Equal Protection Clauses of the US and NY Constitutions (see, US Const, 14th Amend, § 1; NY Const, art I, § 11); and (2) is irrational as a matter of law. As to the second argument, at least as applied in this case, the court is in agreement.
LEGISLATIVE HISTORY
New York’s current bail statutes (CPL 500.10 et seq.) are descended from the 1881 Code of Criminal Procedure, enacted at a time when the assessed value of real property was its fair market value. A parity as between assessed and market value of real estate would continue well into the present century. Nevertheless, the Code made no special provision for the posting of realty for purposes of bail, merely providing that the surety "shall be worth the amount specified in his undertaking, exclusive of property exempt from execution” (see, Code Crim Pro § 569 [2]).
The first provisions specifically relating to the posting of real estate for purposes of bail are found in Laws of 1936 (ch 891), adding, inter alla, a subdivision (3) to provide that if real property were to be offered as security for bail "the assessed value of the said real estate, after deducting therefrom the amount of any other undertakings, mortgages, tax liens, water charges, or other liens of whatever nature upon said real estate, shall be not less than the amount specified in the undertaking.”
This legislation enjoyed widespread support; it was seen as "needed to * * * eliminate evils which have been widespread in the past” (Citizens Union of City of NY mem to Gov. Lehman, May 23, 1936; emphasis added).
Thereafter, in 1942 further efforts were made to reform bail policy and procedure. Section 569 (1) of the Code of Criminal *219 Procedure was amended to give legislative sanction to the unofficial maintenance of "a list of undesirable bondsmen * * * [who have] used the same property on bail or as security for bail more than twice within a period of thirty days” (see, Assn of Bar of City of NY, Comm on Crim Cts Law and Procedure, Report No. 100 [1942]; emphasis added). Subdivision (3) was amended in tandem to require that the assessed value of real estate utilized to secure a bail bond "shall be at least twice the amount specified in the undertaking, and said real estate must not appear upon any official list of undesirable properties” (see, L 1942, ch 823; emphasis added).
An enunciated purpose of the amendment was to make the then-current practice uniform as well as to insure the adequacy of the security offered. In support of this position the Attorney-General furnished the Governor a memorandum noting that "in many instances where a smaller equity was accepted it was found that there were highly questionable circumstances surrounding the acceptance of the bail” (Office of Attorney-General mem to Gov. Lehman, Apr. 23, 1942; emphasis added).
The unambiguous intertwining of "evils”, "undesirable bondsmen”, "undesirable properties” and "highly questionable circumstances” with "adequacy” of the security offered for the purposes of bail appears regularly in a sampling of the reform literature of the period.
In 1965, subdivision (3) of section 569 of the Code of Criminal Procedure was once again revised (see, L 1965, ch 273). The revision continued the use of double valuation — this portion of the proposed legislation was opposed by the Association of the Bar of the City of New York (see, 1965 Legis Bull No. 42) — but provided that value be determined not by assessed value solely, but rather by "dividing the last assessed value * * * by the last given equalization rate”. This aspect of the amendment received widespread support from various governmental and bar association groups.
The effect of the 1965 revision is to increase the evaluation of real estate offered as security for bail to a more realistic figure. Prior to the bill’s passage, many owners found their real property to tally valueless for bail purposes. By said time, due solely to purposes of taxation, a gap had developed in the parity between the assessed and the market value of realty. In the ensuing years, New York City tax policy in particular has widened the gap. Utilization of the equalization rate in the *220 bail statute was seen as an effort to increase the value of the equity of the owner of real estate to enable more persons accused of crime to post bail.
Notwithstanding, even though the 1965 amendment made real estate valuation vis-á-vis bail more equitable, it by no means made such valuation reflective of market value.[4] For this reason, the State Board of Equalization and Assessment noted that it "cannot recommend approval of this bill.”[5]
In 1970, the Code of Criminal Procedure was repealed in its entirety and the present Criminal Procedure Law was enacted in its stead, effective September 1, 1971 (L 1970, ch 996).[6] Subdivision (17) (b) of section 500.10 of the new law replaced subdivision (3) of section 569 of the former Code. The new subdivision is substantially the same as the former subdivision and employs the same formulation. All statutory reference(s) to "undesirable bondsmen” and "undesirable properties” had by 1970 disappeared.
*221 PRESUMPTION OF CONSTITUTIONALITY
The analysis called for here must begin with the principle, firmly established, that a legislative enactment is cloaked with a strong presumption of constitutionality. Our courts have pronounced on occasions too numerous to cite the fundamental rule that said presumption exists in favor of all legislative enactments, and when attacked as unconstitutional every statute is otherwise presumed. While the presumption is, in the final measure, a rebuttable one, its challengers bear the heavy burden of proving the questioned legislation unconstitutional beyond a reasonable doubt.
Despite this heavy burden, "due process demands that a law be not unreasonable or arbitrary and that it be reasonably related and applied to some actual and manifest evil” (Defiance Milk Prods. Co. v Du Mond, 309 NY 537, 541 [1956]).
Judicial review of a challenged statute revolves about an inquiry as to whether "any state of facts known or to be assumed justifies the disputed measure” (Lighthouse Shores v Town of Islip, 41 NY2d 7, 11-12 [1976]). And, where statutory language is clear and unambiguous, interpretation of the statute must give effect to the words used by a coequal branch of government, unless "such application would cause an anachronistic or absurd result contrary to the contextual purpose of the enactment” (Doctors Council v New York City Employees Retirement Sys., 71 NY2d 669, 675 [1988]).
defendant’s equal protection argument
Turning first to defendant’s argument under the Equal Protection Clause(s), the underlying rationale of the "suspect classification” theory is applicable to legislation affecting discreet and insular minorities. While suspect classifications deserving of special scrutiny do include those based on race or national origin, defendant couches his argument in terms of "persons without liquid assets but with real property — a situation affecting many relatively poor persons”. And while, indeed, "a sizeable percentage * * * are Black and Latino”, defendant’s mere conjecture of a denial of equal protection of the laws need not, in the absence of evidence of invidious distinctions between classes of citizens, be subject to the strict review scrutiny otherwise required where purposeful unequal treatment or resulting disproportionate harm is alleged. In the absence of a stark pattern that a statute bears more heavily on one race or ethnic group than upon another, *222 impact alone is not determinative of whether there is a violation of the Equal Protection Clause(s) (see, Arlington Hgts. v Metropolitan Hous. Corp., 429 US 252 [1977], on remand 558 F2d 1283, cert denied 434 US 1025 [1978]).
As for a classification based on wealth, the United States Supreme Court has never invoked the stricter standard for reviewing same unless said classification deprived persons of a fundamental constitutional right.
Both the Federal and State Constitutions contain a prohibition against excessive bail (see, US Const 8th Amend; NY Const, art I, § 5), but there is no per se absolute right to bail; there is only a right to have bail determined in accordance with law. Nor is bail considered to be excessive merely because a defendant cannot furnish it (see, Jennings v Abrams, 565 F Supp 137 [1983]).
On the question of equal protection, then, the court is not at all here concerned with any fundamental right to bail (see, Sistrunk v Lyons, 646 F2d 64 [3d Cir 1981]) or with any Eighth/Fourteenth Amendment question of bail excessiveness (see, Pilkinton v Circuit Ct., 324 F2d 45 [8th Cir 1963]). Its concern, instead, is with the double equity provision of paragraph (b) of CPL 500.10 (17), hardly to be classified as an implicit "fundamental right” or based upon a showing of suspect criterion, which must then be construed to be of constitutional dimension. The applicable measure, therefore, must be the "rational basis” standard of review.[7] This lesser standard of scrutiny is determinative of constitutionality under defendant’s second argument, that of irrationality as a matter of law (see, Maresca v Cuomo, 64 NY2d 242 [1984]).
defendant’s irrationality argument
One must always be wary that assertions of irrationality are not simply reflections in the eye of the beholder. Under traditional rational basis analysis, a legislative enactment will pass constitutional muster if some legitimate State interest is extant (see, Schweiker v Wilson, 450 US 221 [1981]; People v Drayton, 39 NY2d 580 [1976]). There can be little doubt, *223 however, that the challenged subsection is the most severe and inflexible of the eight forms of bail applicable and specifically designated by law.[8]
Two pincers form Mr. Burton’s argument questioning the rationality of imposing an additional burden on real property owners which is not shared by owners of any other form of property: (a) the double equity requirement, and (b) the assessed value/equalization rate formula as the basis of determining value under the requirement.
In deciding if it is rational to treat real property owners differently, this court accords the considered judgment of the Legislature great weight. Nor is it unaware of a further presumption: that the Legislature investigated and found there existed a situation, namely, an abusive bail bondsman system then in odorous bloom, and that the necessity for adequately protecting the interest of the State from overreaching and fraudulent practices inherent where "undesirable property” was offered as security by "undesirable bondsmen” was indicative of the need for and desirability of the statute now in question, as well as sufficient empirical support for its provisions (see, Hotel Dorset Co. v Trust for Cultural Resources, 46 NY2d 358 [1978]; Health Ins. Assn. v Harnett, 44 NY2d 302 [1978]). Further inquiry inevitably involves substantive judgments about legislative motives. Such judicial oversight is hazardous at best, and courts are not free to invalidate a challenged statute because of a disagreement over legislative wisdom or to substitute their opinion for the judgment of the Legislature (see, Matter of Rochester Gas & Elec. Corp. v Public Serv. Commn., 71 NY2d 313 [1988]; Hotel Dorset Co. v Trust for Cultural Resources, supra; People v Abrahams, 40 NY2d 277 [1976]).
CHANGED CONDITIONS
The constitutionality of an act depends on its real character, its practical operation and effect, rather than on its professions of purpose (see, Matter of Zorach v Clauson, 303 NY 161, affd 343 US 306 [1951]), and in examining the question refer *224 ence must necessarily be had to subsequent developments which may have changed the validity of information before the Legislature at the time of its enactment (see, People v Askew, 93 Misc 2d 754 [Sup Ct, Bronx County 1978], affd 66 AD2d 710 [1978]). Legislation valid when adopted will nevertheless fall as invalid when, at a later time, its operation under changed conditions proves unconstitutional (see, Vernon Park Realty v City of Mount Vernon, 307 NY 493 [1956]).
The United States Supreme Court has adopted this position in Leary v United States (395 US 6 [1969]). Mr. Justice Harlan, speaking for the majority, stated (at 38) that:
"Since the determination of the presumption’s constitutionality is 'highly empirical’ [United States v Gainey, 380 US 63, 67] it follows that we must canvass the available, pertinent data. * * *
"[W]e have not confined ourselves to data available at the time the presumption was enacted * * * but have also considered more recent information * * * to ascertain whether the intervening years have witnessed significant changes which might bear on the presumption’s validity.”
Ultimately, the court need only determine whether the measure before it is a reasonable one for achieving a valid goal of the State (see, People v Drayton, supra).
The 1970 abolition of the Code of Criminal Procedure combines with subsequent amendment of the Criminal Procedure Law which replaced it to represent substantial reform of the entire system of bail. "In structure, substance, form, phraseology and general approach, the * * * Criminal Procedure Law bears little resemblance to the distinctly archaic Code of Criminal Procedure. * * * [I]t lays a new foundation and, in the process, proposes numerous significant changes of substance in an attempt to provide a workable body of procedure accommodated to modern times. Among the innovations are * * * a reformulated system of bail and release on recognizance” (Commn on Rev of Penal Law and Criminal Code, mem in support and explanation, Mar. 1970).[9]
These innovations include two intermediate bail devices, one termed a "partially secured bail bond” and the other an "unsecured bail bond” (CPL 500.10 [18], [19]). The theory behind the legislative intervention to relax the forms of bail for individuals charged was made even more liberal in its financial impingement by a 1972 amendment (L 1972, ch 784) *225 "to effect a change in emphasis from a preference for the more severe forms to the least burdensome ones. * * * Thus, when a judge simply fixed bail at $1000, this meant that the defendant had to raise it, if he could, in cash, or post either an insurance company bond or a full secured bond in that amount. A partially secured or unsecured bond would suffice only when explicitly permitted by the court. Under the amendment, this approach was completely reversed.
"Designation of a bail figure without more, instead of demanding the most severe forms calls for the least severe, namely the unsecured bond. If the court wants a more severe category, it must specify” (Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 520.10, at 41).
That the Legislature could, and in fact did, reasonably shift emphasis to a presumption in favor of pretrial release, providing both alternative methods of release as well as a method to reduce that portion of the prison population comprised of unconvicted defendants, is conceded. It is common ground that New York’s statutory scheme manifests a continuing sensitivity for the rights of criminal defendants, and reflects an admirable attempt to reduce the cost of liberty for those citizens awaiting trial.
COMMENTARY
As it must, the court assumes a rationality between the gravity of the "evils” found by the Legislature for its 1942 passage of the double equity requirement yet still found in CPL 500 (17) (b). The declaration of its enactors, apparent from the bill title: "A[n act] to amend the code of criminal procedure, in relation to the qualifications of bail and bondsmen”[10] (L 1942, ch 823) appears to have well responded to a then existing public necessity. It is said that the utilization of commercial bondsmen to secure bail with real property, not to speak of real property itself, quickly became all but nonexistent under New York practice.[11]
*226 Thus, the unavoidable question: Does a rational relationship between the gravity of those "evils” square with the contextual purpose of today’s statute in light of further legislative wisdom? As applied to this case, the court thinks not.
One need but lay the double equity requirement aimed at rectifying an offensive situation beside an expansive reading of the law as presently structured to find an anomaly — a heavy and irretrievable burden visited not upon offending professional bail bondsmen but upon the accused possessed of little resource where a court, despite an inclination to release a "good risk” defendant, feels impelled to fix bail in an amount reflective of factual matters that must be taken into account: " ‘[t]he nature of the offense, the penalty which may be imposed, the probability of the willing appearance of the defendant or his flight to avoid punishment, the pecuniary and social condition of the defendant and his general reputation and character, and the apparent nature and strength of the proof as bearing on the probability of his conviction’ ” (People ex rel. Lobell v McDonnell, 296 NY 109, 111 [1947]; see also, CPL 510.30 [2]; Matter of Sardino v State Commn. on Judicial Conduct, 58 NY2d 286 [1983]). Such is this court’s thinking with respect to Mr. Burton.
No abusive bondsman is to be found here; that species is now an "endangered” one. Simply, a private surety wishes to encumber his real estate (which has a value one half times again the total amount of the required undertaking, at minimum) to secure the liberty of his son. The court sees neither overreaching nor the perpetration of a fraud. Presumably, at least, upon his doing so an interim right will accrue to the State that safeguards its interest should bail be jumped.
Taking further account of the legislative goal of "adequacy” for the 1942 passage, given that its later wisdom is to afford a defendant liberty merely by having him incur a legal obligation (under the form of an unsecured bond), double equity as a "reasonable minimum requirement pursuant to which the enforcement and collection of forfeitures will be substantially aided” (Attorney-General mem to Gov Lehman, Apr. 23, 1942) sweeps too broadly. Although an arbitrary distinction may be part of a rational pattern to achieve a permissible end, and the judiciary must defer to legislative enactments rationally related to such an intended purpose, the inflexible exception as presented here (i.e., the singular statutory requirement for "at least twice the total amount of the undertaking” with respect to securing bail with realty as *227 opposed to any other form of security) anachronistically lacks a discernable connection to a commonsense interpretation of revised legislative intent, as well as not comporting with it.
It is countered by the People that "real property is notorious for its fluctuation in value.” This, likewise, was a reason put forth in justification for the 1942 amendment, "the fluctuating * * * value of real estate” (Attorney-General mem, id.). While defendant cogently points to the fact that the amendment "was adopted during a period when all real property was enormously depressed [by the effects of the Great Depression] and [it was] virtually impossible to convey at anything near true market value,” the court is more properly impressed by the present-day implications of Mr. Burton’s further argument that "stocks and bonds are * * * far more subject to wild fluctuations than real estate.” So, too, gold, diamonds, stamps and the like. Yet these forms of personal property freely qualify for bail purposes at equity value under the offending paragraph’s sister provision (see, CPL 500.10 [17] [a]). Tangible value is otherwise always a matter of the exercise of a sound discretion.
Reliance by the People on United States v Auriemma (773 F2d 1520 [11th Cir 1985]) is also misplaced. In Auriemma, the court declined to treat with the validity of a District Court order terminating the practice of securing bonds in criminal cases with real estate, because such practice "generated voluminous paperwork and record keeping far beyond the capacity of our already overburdened Clerk’s staff” (supra, at 1521, appendix). Notwithstanding, what emerges from Federal practice is a picture significantly distant, real property routinely being accepted for purposes of bail at market value, less encumbrances.
But nowhere does the irrationality of the offending statute reveal itself more plainly than in one course of action, quite correctly suggested to — indeed, urged upon — defendant by the People, that should the subject property be liquidated and converted to personalty, the resulting cash would more than satisfy the required bail.
CONCLUSION
Manifestly, CPL 500.10 (17) (b) is here inconsistent with the present-day statute. It is neither a just exaction nor a reasonable demand, nor has the subdivision, as the People contend, "been tested through experience”; nor is it at all clear that it *228 any longer serves the beneficial purpose of its original enactment.
In any case, a legislative act directed against a known and stated evil is not to be stretched to cover situations having no reasonable relationship to that evil. The statute’s central feature to restrict severely the activities of professional bail bondsmen and secure the State in said dealings in the event of forfeiture, where as here no salus populi is evident, translates into an arbitrary and oppressive barrier to due process of law. The innovative alternatives that the Legislature in more recent judgment(s) encourages our courts to fashion on behalf of citizens who might avail themselves of whatever resources are available to secure release from custody pending trial are thereby frustrated. Such legislative mitigations represent a value judgment sufficient to meet the ends of our criminal justice system.
Plainly, then, it is undeniable that vis-á-vis Mr. Burton the double equity requirement of paragraph (b) is operating unreasonably beyond the occasion of its enactment. Against this background, the record does not reveal the furtherance of a substantial State interest in the face of a requirement that more than incidentally interferes with his personal liberty. Following later day legislative pronouncements on the subject, under the facts of the present case, so much of the tenuous distinction that dictates the posting of real property having a value "at least twice the total amount of the undertaking” is facially invalid.
Having so determined, the court finds no reason of necessity to treat with the assessed value/equalization rate formula outlined thereunder.
Previously satisfying itself that the proffered realty is valued in an amount greater than the total amount of the required undertaking, the filing of the appropriate supporting affidavit(s) for its posting is directed.
[Portions of opinion omitted for purposes of publication.]

. These are four in number: Class I is comprised of one, two and three-family houses; Class II is comprised of apartment houses, including co-ops, condominiums and rentals; Class III is comprised of utility properties; and Class IV is comprised of all other types of commercial property (see, Real Property Tax Law § 1802 [1]).

. The applicable equalization rate established by the City of New York, applying different formulas for each class, is the percentage of every $100 in assessed value, namely, 8.9%, 45%, 50% and 45%, respectively. (See, People v Burton, 148 Misc 2d 716, 720, n 5.)

. The constitutionality of the bail system of the State of New York was questioned, by way of CPLR article 78, in 1973. The First Department held respecting article 500 et seq., "[W]hile in an individual case from time to time, error may occur and should be redressed, no constitutional impediment exists to the present New York State bail system as correctly applied.” (Bellamy v Judges & Justices of N. Y. Criminal Ct., 41 AD2d 196, 203 [1st Dept 1973], affd without opn 32 NY2d 886 [1973]; see also, People v Figueora, 43 AD2d 648 [3d Dept 1973]). The case neither involved nor discussed CPL 500.10 (17) (b).

. The People concede "it is obvious the formula was not meant to result in a 100% accurate figure”.

. The Board’s specific objections related to the following:
(1) The fact that the equalization rate is computed under a mathematical procedure using the percentage of market value by which all classes of real property are assessed on each respective assessment role; such a State-wide "blended” average cannot be utilized in determining a realistic full value of a particular parcel.
(2) The legislation does not require that the equalization rate for the assessment role from which the last assessed valuation is taken be used, but merely requires the use of the "last given equalization rate”; since equalization rates are established months after the assessment roles are completed and filed, the equalization rate utilized under the bail statute will often be for the year prior to the one in which the assessment was made.
As to the equalization rate computation under the first objection, this court has previously determined that if the formula is to be used at all, the equalization rate utilized herein must be one relating specifically to New York City Class I residential property, rather than any State-wide "blended” rate (see, People v Burton, 148 Misc 2d 716 [1990]; see also, People v Sherman, 132 Misc 2d 15 [Sup Ct, NY County 1986]).
The court did not, and does not now, find it necessary to reach the second technical objection.

. In his commentary respecting its predecessor, Richard G. Denzer noted: "Possibly the most archaic and poorly drawn provisions of the Criminal Code were those dealing with the subject of bail * * *. Many of them appear virtually unintelligible and, in their entirety, they presented a chaotic scheme that defies summary or analysis” (see, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, at 8 [1971]).

. "The term 'rational,’ of course, includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to members of the disadvantaged class.” (Cleburne v Cleburne Living Center, 473 US 432, 452 [1985] [Stevens, J., concurring] [in examining the rational basis for a classification].)

. These are (1) cash bail, (2) insurance company bond, (3) secured surety bond, (4) secured appearance bond, (5) partially secured surety bond, (6) partially secured appearance bond, (7) unsecured surety bond and (8) unsecured appearance bond (see, CPL 520.10). In 1986, a ninth form of bail was authorized, namely, "[c]redit card or similar device” for use vis-á-vis vehicle and traffic law violations (L 1986, ch 708).

. See, n 6, supra.

. See, 1942 NY Senate Bill S 1221, 1942 NY Assembly Bill A 1786.

. The court is likewise so advised: "Counsel know of no instance in which real property has been accepted in this or any other county, thus depriving owners of such property of the use of an available asset to avail themselves of the federal and state constitutional provisions of posting bail”.
See, also, Assn of Bar of City of NY, Comm on Grim Cts, 1965 Legis Bull No. 42, noting, inter alla, "it appears that real estate is rarely offered as security for bail in the New York metropolitan area”.